GARDNER VALVE MANUFACTURING COMPANY, appellant,

*v.*

JOHN L. HALYBURTON, respondent.

[Decided July 13th, 1917.]

On appeal from a decree of the court of chancery advised by Vice-Chancellor Stevens, who filed the following opinion:

This is a bill to compel specific performance of a contract to assign patents for straight way valves. The defendant, Halyburton, invented them in 1902. From that time on, he made efforts to interest capitalists in their manufacture but without success. In the fall of 1906 he was introduced to Elsworth P. Baylor, a coal dealer and merchant in Hampton, or Junction, as it was then called, a small town on the New Jersey Central railroad about fifty miles from New York. Baylor was eager to have a factory built there and lent a ready ear to Halyburton's proposal that a company should be organized with a view to there carrying on the business. It was thought that if $100,000 could be raised by a sale of preferred stock that would suffice to erect the building and commence operations.

In October, 1906, a company was incorporated with an authorized capital of $300,000, divided into twelve thousand shares, of which four thousand were to be preferred stock and eight thousand common. The plan, for it hardly rose to the dignity of an agreement, was for Baylor to procure subscriptions to the amount of $20,000, and for Halyburton to procure them to the amount of $80,000. Halyburton was to transfer to the company his patent, when issued, and receive therefor the common stock ($200,000). The original subscribers to the organization stock were Halyburton, Baylor and a figure head, Burrell. These were also the first directors. Although they made considerable effort, neither Baylor nor Halyburton was able to procure any subscriptions. This is not surprising, for the patents had not as yet been issued and no practical demonstration of the merits of the invention had been made. Baylor, however, had so much confidence in the ultimate success of the enterprise, that by January, 1909, he had advanced to the company to pay current expenses $3,200. Nearly all this money was received by Halyburton for salary, to enable him to maintain himself while engaged in bringing his invention to the notice of the public. He had no money of his own.

Up to the fall of 1908 nothing had been accomplished, and Baylor, evidently, had become anxious to get security for what he had put in. At a meeting held on January 30th, 1909, the board of directors, then consisting of Baylor, Halyburton and

Transue, authorized an issue to him of one hundred and twenty-eight shares of the preferred stock, for the money he had advanced. At the same meeting there was taken the action on which this suit is based. I quote from the minutes:

"The Secretary then presented the following communication received from John Halyburton: 'To the Board of Directors of the Gardner Valve Manufacturing Co., Gentlemen, I have pending applications for letters patent of the United States upon a new and novel invention for straight way valves.

" 'I hereby agree that if you will issue to me 7,996 shares of your common capital stock, I will sell and assign to you such applications and the letters patent when granted and also all improvements I may hereafter make thereon.

" 'Very truly yours,

" 'Jan. 30th/09.                         JOHN L. HALYBURTON.'

"On motion of Frank Transue [who had been substituted in the board for Burrell] the proposition of John L. Halyburton was accepted and the secretary directed to notify him that when the actual assignments covering all patents issued and applied for at the date of this meeting were made to the corporation, there would be issued to him or such person as he might nominate common capital stock of this company amounting to 7,996 shares."

Upon the strength of this action Baylor advanced to the company $2,000, in addition to the $3,200 already advanced. This went partly to Halyburton as salary and partly to pay for a catalogue and some valves then being made under Halyburton's direction by others. Halyburton, at, or shortly after this time, secured from Transue, who had become president, and from one or two other acquaintances about $3,000 more. No stock was issued to these gentlemen and they now disclaim any interest in the company by reason of what they contributed. The only person other than Baylor who seems to make any claim is the witness Lepper, an engineer, who at the beginning gave a little money and did some drafting.

The minute book does not record any meeting after that held in January, 1909, until July 29th, 1914, when it was resolved by Baylor and Flynn (who had taken Transue's place) that there be issued seven thousand nine hundred and ninety-six shares of the common stock to Halyburton, the same to be delivered upon his executing an assignment of his letters patent. What interest Flynn had in the company (if any) does not appear. Evidently,

the action was taken with a view to the commencement of a suit for the benefit of Baylor and Lepper. The company, as far as appears, owed no debts. The only assets were the patents, if their transfer could be compelled. In case of dissolution Baylor as a holder of preferred stock would, under the certificate of incorporation, be entitled to a preference in the distribution.

Halyburton had moved his family to Hampton, in 1909, and remained there until 'the spring of 1911. Having, during that interval, failed to secure the needed capital, he began to make efforts to start the manufacture elsewhere. At the beginning these efforts were known to and acquiesced in by Baylor. On December 12th, 1912, without informing Baylor, Halyburton made an agreement with the defendant the American Car and Foundry Company by which he gave it "the exclusive right to manufacture, use and sell, and to be caused to be manufactured, used and sold, articles and devices embodying his inventions." The company, on its part, agreed to equip at its Berwick, Pennsylvania, plant a department for the manufacture of valves and to take Halyburton into its employ for five years. It has spent nearly $100,000 in carrying out this agreement. Its vice-president, Mr. Dickerman, says that he thinks the valve a good one. He testifies further that they have attempted to market it in a small way with unsatisfactory results; that they have scrapped valve parts that had cost them ten or twelve thousand dollars; that they have made very material improvements, and that they have now reached a point where they are about ready to put it on the market.

Such in brief is the situation. The question is whether the complainant is entitled to a specific performance of Halyburton's accepted proposal. This is resisted, first, on the ground that the court will not enforce performance of a contract which violates the policy of the statute (section 49 of Corporation act) authorizing stock to be issued for property purchased, to the amount of the value thereof. Second, on the ground of laches.

In reply to the first objection complainant contends that the patents were worth $200,000, and that, if not, the defence is not specifically set up in the answer. If the contract be illegal the court cannot give it effect. If it be "one, the enforcement of which

would violate public policy," said Mr. Justice Dixon in *Minzesheimer* v. *Doolittle, 60 N. J. Eq. 397*, "the court will not, for any delinquency of defendant (in the matter of pleading), lend its assistance to such violation."

It is perfectly plain, on the evidence, that this contract does violate the policy of the Corporation act. There is no proof worthy of the name that the invention in its then stage of development was worth $200,000. Lepper, indeed, testifies that it was worth, in his opinion, $300,000, but the very ground on which he bases it shows it to be worthless. Asked how he arrived at the amount, he says, "Because it would easily make that much money." Now, if anything is clear, it is that it would *not* easily do so. Halyburton says that he made the invention as early as 1902. For the four years before the company was organized, he had been trying to interest capital on its behalf and had failed. The company was formed in 1906, and for two years thereafter, devoting all his time and energies to its perfection and to an endeavor, with Baylor's assistance, to procure subscriptions to the capital stock, he accomplished nothing. The first patent did not issue till October, 1908, and the second until October, 1910. The resolution accepting Halyburton's proposal was passed in January, 1909, and over two more years were consumed in a further endeavor to put a few valves, made by outsiders, on the market, and to induce others to take up their manufacture, but without success. Finally, Halyburton made his agreement with the car company, and even then the invention had not reached a stage of development in which it became practically remunerative. The car company, after creating at great expense a department for the manufacture, was obliged to scrap valve parts that had cost ten or twelve thousand dollars. Mr. Dickerman says that with the very material improvements that they have made, he expects to be able to market the valves, but has not as yet done so. Halyburton assigned his patent rights in consideration of a five years' employment, first, at a salary of $250 per month, and then on a commission equal to one and one-half per cent. of the net selling price of all articles embodying his invention.

This statement shows how impossible it would have been, on an honest valuation, to declare that in 1909, in its then condi-

tion, the invention was worth $200,000. In fact, no declaration or valuation of any sort was made or attempted. The directors did not go through the formality of resolving that it was worth that or any other sum; and that they did not intend to give Halyburton stock to that amount is apparent from the understanding of all concerned that upon its issuance he would return half of it to the company's treasury. If this court should enforce the contract, it would do so against the statute and the course of decisions. *Volney* v. *Nixon, 68 N. J. Eq. 605; Eastern National Bank* v. *American Brick Co., 70 N. J. Eq. 732; Ecuadorian Association* v. *Ecuador Company, 71 N. J. Eq. 757.*

But even if the contract was legally enforceable, there have been such laches' as would prevent its enforcement. According to its terms it was enforceable immediately. Defendants argue that it was conditioned upon the raising of $100,000 cash capital. I doubt if the evidence sustains this contention. I am strongly inclined to think that, as Transue suggests in his letter of October 25th, 1909, and as Baylor testifies, the real reason why the resolution was passed was that Baylor wanted security for his past advances and for the money he was about to advance and that Halyburton was willing to give it. The proposal having been made and accepted, Baylor thought himself safe. He did not want a formal transfer and a formal issue of stock because, as he said in one of his letters, that would have imposed upon the company the necessity of paying a larger franchise tax. After the year 1910, both Halyburton and Baylor appear to have given up all hope of raising the necessary capital. At that time the three directors were Baylor, the treasurer; Transue, the president, and Halyburton. Baylor and Transue knew that Halyburton had begun to make an effort to establish a plant elsewhere. Transue knew, before he broke with Baylor, that Halyburton was negotiating with the car company. Baylor did not know this, but he had every reason to believe that he was still trying to put his patent to account. Under these circumstances, it would seem that it was the duty of complainant, if it wished to insist upon its rights, to have taken some action. It (and Baylor, Halyburton and Transue were the company) must have supposed that Halyburton was likely to do that which would

trench upon those rights and that others might innocently be drawn into expending money because of Halyburton's apparent ownership. The mental attitude of these two gentlemen is no doubt correctly depicted in the letters written by Transue to Baylor at that time. In that of October 25th, 1909, he says:

"I don't see what cause you have for worriment as you are better protected than any other person, in case there was a failure and in the event of success you will get more out of it than any one else. * * * I have nothing to show for the amount of money I have in it but I feel absolutely safe. We have our remedy, if anything goes wrong, and Halyburton has everything to lose. The patent rights, in my estimation, are very valuable and would if offered for sale, bring a great deal more than what you and I have already put in the Company."

In another letter written, subsequently, he says:

"We are preferred stockholders [in point of fact no stock appears to have been issued to Transue] and as such come in ahead of him [Halyburton]. The agreement that he made to assign those patent rights will hold him as he gets common stock for it and would therefore, in case of a failure or receivership, come in after us. * * * I am only saying this in the event anything should happen and *you are forced to do something. I think the best thing for us is to say nothing about it to any outsider and let the matter drift along* until such time as he finds out that he can't raise the funds and asks for help."

It is quite probable that the matter would have "drifted" until now had it not been for the agreement made with the car company. This company, unquestionably, acted in good faith and without actual knowledge of the accepted proposal. It searched the record of assignments of patents and found nothing; and it spent large sums of money in making the invention practicable. The bill was filed in September, 1914, nearly six years after the right to demand the transfer had accrued. Baylor says that after Halyburton left Hampton he did not know where he was. He made some effort to locate him. It is not pretended that Halyburton was in hiding and Transue knew where he could be found. I have no doubt, under the evidence, that a painstaking effort on Baylor's part would have been attended with success. Without reference to the question whether the inspection of the Gardner Valve Company's catalogue, stating on its cover that it was the manufacturer (not the assignee or sole licensee) of Halyburton valves, affected the car company with constructive

notice of the existence of the contract, it seems to me that the fact that the complainant waited so long (whether because Baylor did not want to pay a larger franchise tax or for other reasons), and the further fact that the car company has in good faith spent so much money on the faith of Halyburton's representation, that all previous negotiations with others had fallen through and that he was free to negotiate would make it highly inequitable now to enforce a specific performance.

The amended bill prays in the alternative that in case a specific performance be refused Halyburton may be decreed to refund the money advanced to him. The company paid Halyburton an agreed salary. It is not pretended that he was remiss in his endeavor to promote the company's success. He performed the service for which the money was paid. On what principle, then, can he be decreed to return it? He treated Baylor shabbily in not at least tendering himself ready, at some future time, if he could, to repay the whole or a part of the money which he had received from him and which had enabled him to live. But the venture was a speculative one. It was so regarded by the four other gentlemen who also gave their money. There was no agreement to return it in case of failure, and, consequently, no legal ground upon which a money decree can be based.

*Mr. Linton Satterthwaite* and *Messrs. McCarter & English,* for the appellant.

*Messrs. Collins & Corbin,* for the respondents.

PER CURIAM.

The decree appealed from will be affirmed, for the reasons stated in the opinion filed in the court below by Vice-Chancellor Stevens.

*For affirmance*—GARRISON, SWAYZE, TRENCHARD, PARKER, BERGEN, MINTURN, KALISCH, BLACK, HEPPENHEIMER, WILLIAMS, TAYLOR, GARDNER—12.

*For reversal*—None.